UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MICHAEL BRISCOE,
      Plaintiff,   :
         :
VS.   :
         :  Civil Action No.: :
CITY OF NEW HAVEN,   :
      Defendant.   :  October 15, 2009

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The 2003 New Haven fire lieutenant examination had two parts: a multiple-choice written test and an oral exam. Ranking on the eligibility list depended on how the City chose to weight the scores on the two components. The oral exam was a better way to assess candidates' skills and abilities than the written test and had less disparate impact on African-Americans. Yet the City chose to weight the written test 60 percent and the oral exam 40 percent. This weighting reduced the validity of the overall selection process; it was arbitrarily chosen, without any pretense that it was job related; it was contrary to standard practice among similar public safety agencies, where the norm is to weight the oral component 70 percent; it had a disparate impact on African-American candidates; and it will prevent the plaintiff from being promoted to the rank of lieutenant, even though he is one of the most highly qualified candidates.

### JURISDICTION AND PARTIES

2.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*, as amended. This court has jurisdiction pursuant to 42 U.S. C. Section 2000e-5(f) and 28 U.S.C. Sections 1331 and 1343.

1

3. The plaintiff is a New Haven firefighter who took the 2003 lieutenant examination. He is African-American. He demonstrated superior qualifications for promotion by achieving the top score of all the candidates on the oral exam, but because of the 60/40 written/oral weighting he will not be eligible for promotion. Because the City did not disclose the scores of any named candidates for years after the examination, the plaintiff until recently did not know his overall examination score, his rank on the uncertified lieutenant list, or the effect of the 60/40 weighting on his promotional opportunities.

4. The City of New Haven is a municipal employer subject to Title VII. Unless enjoined by this court it will use the 60/40 weighting to exclude the plaintiff from the lieutenant position despite his outstanding qualifications. At civil service hearings and in the *Ricci v. DeStefano* litigation the City criticized the work of its hired consultant, but it never addressed, much less questioned, the job relatedness of its own choice of the 60/40 weighting. Likewise, the City suggested changing the weighting after it had already administered the examination and had been taken to court for refusing to certify the results, but it did not acknowledge that it should never have used the 60/40 weighting in the first place.

## FACTUAL ALLEGATIONS

5. The 2003 lieutenant examination was prepared by a commercial vendor called I/O Solutions (IOS). However, the City dictated to IOS the requirement that 60 percent of candidates' scores would be determined by a written, multiple choice test. The City did not believe that the 60 percent weighting that it required was job related, and it knew from its own past experience that the weighting would have a disparate impact on African-American candidates: for example, on the lieutenant exam immediately preceding the 2003 exam, the African-American candidates

as a group performed substantially better than the white candidates on the oral exam, but they were scored much lower overall because of the 60 percent weight given to the written test.

6. IOS also knew based on its training and experience that the written test it provided would have a large disparate impact on African-American candidates. It knew that the 60/40 written/oral weighting was not validated or job related. It knew that increasing the weight of the oral exam would increase the validity of the examination as a whole. And it knew that the greater the weight given the written test, the greater would be the effect of that test's disparate impact on the African-American candidates. Using the statistically accepted measure of differences in terms of standard deviations, the group difference between whites and African-Americans on the written test was more than triple the group difference on the oral exam.

7. However, the City never asked IOS for any input on the advisability of using a written multiple choice test or of the 60/40 weighting. Even after the examination was administered, the City failed to request the technical report that IOS had agreed to provide and that could have provided information about the disparate impact and validity of the 60 percent rule.

8. A scoring system that gave greater weight to the oral portion of the test would have been more job related than the 60 percent weighting on the written test that the City imposed. As described below, the oral exam was much more closely related to actual job performance than the written test.

9. Candidates at the oral exam were given several situational questions or problems describing scenarios ranging from fire scene incident command to personnel management. They were then required to describe in detail how they would handle each scenario. All the questions

were intended to be practical and to force candidates to provide detailed responses to specific situations. IOS tried to pick scenarios that would test a large number of skills and abilities within the same scenario. The oral exam was intended both to test job knowledge and to be particularly valuable for assessing the managerial and leadership skills of candidates for the supervisory position of lieutenant.

    10.    IOS described some of the scenarios as follows:

- *The candidate is given a very specific fire scene that he or she might arrive at, including the specific details about that scene, and asked what he or she would do from start to finish to deal with that scene.*

- *The candidate is presented with a very elaborate scenario detailing conditions and circumstances that are to be addressed through a training program and then asked how he or she would go about developing and administering that training.*

- *The candidate is presented with an elaborate scenario that details background information on a subordinate and things that have occurred recently that cause the supervisor some concern, and then asked: how are you going to interact with this person and try to rectify this situation?*

    11.    Any concerns about bias or favoritism on the oral exam were addressed by having each three-person rating panel include both white and African-American members and by using as raters only high-ranking fire officers from outside Connecticut.

    12.    In contrast to the oral exam, the written test did not even attempt to measure the skills and abilities required of a fire lieutenant.

    13.    In fact, the written test had little or no value in selecting fire department supervisors. Some of its deficiencies were the following:

- IOS and the City arranged that preparation for the test would be simply an exercise in memorization. They provided the candidates with a list of written materials, from which all the questions were drawn. Candidates

4

were encouraged simply to memorize as much of the materials as they could.

- The test therefore rewarded cramming – the acquisition of identified information in a short period of time for the purpose of regurgitating it once, without regard to whether the regurgitated knowledge is understood or retained. This emphasis on cramming defeated the purpose of the test, which was to determine who would be the best leaders for the department for years or even decades into the future.

- The harm to the selection process – and therefore to the public safety – from this emphasis on cramming was increased by the fact that fire lieutenants in New Haven are guaranteed permanent tenure in their positions absent serious misconduct. They are not required to demonstrate long-term retention of the facts on the test, much less to compete again for their positions.

- In contrast to the oral exam, the material on the written test was presented out of context rather than as information that should be integrated into a supervisor's action plan. The test therefore did not measure the extent to which the candidates had the ability actually to use the information.

- Contrary to professional standards, the written test items were never reviewed by someone familiar with the New Haven department and its needs. The review for local suitability was performed by a fire officer in Georgia, and, inevitably, the test included inappropriate items.

- The written test to a large extent measured test-taking skills rather than essential fire knowledge. The written multiple-choice format gave an advantage to candidates who were good at using test-taking strategies for multiple-choice tests, a skill that is completely unrelated to competence as a fire supervisor.

14. The differences between the written test and the oral exam disadvantaged a candidate, like the plaintiff, who had diligently studied and learned all the material taught during years of on-the-job experience and extensive in-service training, compared to one who did little until the run-up to the exam but then memorized the facts that were included in the assigned written materials. Candidates who demonstrated job related skills and abilities were at a

disadvantage compared with those who showed less skill and ability as fire lieutenants but were strong on memorization and multiple-choice test-taking skills.

15. This effect was real, not hypothetical: most of the top thirteen ranked candidates (all are white) did not score high on the oral exam, the only portion that attempted to measure the candidates' job related skills and abilities; yet all or almost all of these candidates will be promoted. Moreover, those appointments will be permanent because there is no probationary period for the position of lieutenant.

16. The plaintiff's situation is the opposite side of the same coin: the 60 percent weighting of the written test will keep him from being promoted despite his demonstrated superior skills and ability. On the oral exam, he scored the highest of the 77 lieutenant candidates; yet because he did not score well on the written test he will be ranked 24th on the eligibility list and will not be eligible to be promoted.

17. The irrationality and unfairness of the selection process are highlighted by considering what the results would be if the City had chosen to give the test components a weighting more related to selection of the best fire lieutenants. If the oral exam were weighted 60 percent and the written test 40 percent instead of the other way around, the plaintiff would be ranked ninth instead of 24th and would be promotable. If the oral exam were weighted 70 percent – the norm for public safety agencies across America – the plaintiff would be ranked fourth, and three African-Americans instead of none would be in the top 12. And if the written test were not considered – because it added little or nothing to the validity of the examination as a whole – three African-Americans would be in the top 12, and the plaintiff would be at the top of the list, ranked number one.

18. At the time that the City chose to administer the 2003 exam, it had other alternatives readily available that would have better served the goal of public safety and, as the City knew or should have known, would have had much less, if any, exclusionary effect on African-American candidates. These alternatives included: a different weighting of the exam components; elimination of the written component; modification of the written component to reflect more closely the demands of the job; or use of an "assessment center," a selection process designed to replicate as closely as possible actual job performance. If the City had used any of these alternatives instead of the examination that it chose to use, the plaintiff would have ranked high on the resulting employment list.

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

19. The conduct of the City described above has discriminated against the plaintiff, in violation of Title VII of the Civil Rights Act of 1964, *as amended*, Title 42 U.S.C. Sections 2000e *et seq.*

20. As a result of the City's unlawful conduct, the plaintiff is threatened with loss of promotional opportunity and with lost income and benefits.

## PRAYER FOR RELIEF

The plaintiff claims:

1. A preliminary and permanent injunction directing that he be considered immediately eligible for promotion to the rank of lieutenant, with retroactive seniority; or, at least, that the City use a nondiscriminatory selection system to make promotions to any vacant lieutenant positions.

2. A preliminary and permanent injunction prohibiting the City from

   a) adopting or applying a weighting system for the components of any examination for which the plaintiff is or may become eligible that is not job related and justified by business necessity or that is likely to have an adverse impact greater than is required by business necessity; and from

   b) using any selection device for any position for which the plaintiff is or becomes eligible that is not job related and justified by business necessity or that is likely to have an adverse impact greater than is required by business necessity.

3. Appropriate monetary compensation, including backpay and any other compensation to which the plaintiff is entitled;

4. Costs, including reasonable attorneys' fees;

5. Such other and further relief as may appear just to the court.

THE PLAINTIFF

By _____
David N. Rosen
400 Orange Street
New Haven, Connecticut 06511
Ct00196
203-787-3513
drosen@davidrosenlaw.com
His Attorney