# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
:
MICHAEL BRISCOE,                          :
        Plaintiff,                       :
                                         :          3:09-cv-1642 (CSH)
v.                                        :
                                         :
                                         :
CITY OF NEW HAVEN,                        :
        Defendant.                       :
_____ :


## RULING ON MOTIONS OF DEFENDANT AND INTERVENORS
## TO DISMISS PLAINTIFF'S COMPLAINT

**HAIGHT, Senior District Judge:**

In this action Plaintiff Michael Briscoe, an African-American firefighter employed by Defendant City of New Haven ("the City"), sues the City under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff alleges that the City's selection process for promotion to the rank of Lieutenant within the Fire Department had a discriminatory disparate impact upon black firefighters. Plaintiff's Third Amended Complaint ("TAC"), the operative pleading, also asserts a pendent claim under municipal law.

The City and certain Intervenors, who are white firefighters employed by the City, move to dismiss Plaintiff's TAC on various grounds. Plaintiff resists both motions. This Ruling resolves them.

1

**I.**

In the year 2003, the New Haven Fire Department had vacancies in the ranks of Lieutenant and Captain.  Many firefighters wished to be promoted.  In November and December 2003, the Fire Department administered written and oral examinations for promotion to Lieutenant and Captain.  The examinations were designed by I/O Solutions, an Illinois company specializing in entry-level and promotional examinations for public safety (police and fire) departments.  Under the contract between the City and the firefighters' union, the written examination result counted for 60% of an applicant's total score and the oral exam for 40%.  Those with a total score above 70% on the exam would pass.[1]

The case at bar is concerned with promotion to Lieutenant.  Seventy-seven applicants took the Lieutenant exam, of whom 43 were white, 19 black, and 15 Hispanic.  Thirty-four passed, of whom 25 were white, 6 black and 3 Hispanic.  There were 8 vacancies, but because all of the top scorers were white, it appeared that no blacks or Hispanics would be promoted.  Certified promotional lists remained valid for two years.  *Ricci v. DeStefano*, 554 F.Supp.2d 142, 148 (D.Conn. 2006).

The City was concerned about its potential liability for disparate impact if it certified the 2003 examination results and made promotions on the basis of them.  The New Haven Civil Services Board held a hearing on the matter, at the conclusion of which the Board split evenly on

---

[1] This Part's description of prior events is derived in large measure from the Factual Background appearing in Judge Arterton's opinion in *Ricci v. DeStefano*, 554 F.Supp.2d 142 (D.Conn. 2006), an action commenced by seventeen white firefighters and one Hispanic firefighter, who complained about the City's post-examination conduct in respect of promotions.  The history of that case, now referred to in legal vernacular as "*Ricci,*" is briefly recounted in the text of this Ruling.

the question of certifying each exam, with the result that the promotional lists were not certified. That led to the action by the white and Hispanic firefighters in *Ricci*, who had done well in the exams, and alleged that the City discriminated against them by refusing to certify the promotion lists generated by the exam results. Judge Arterton granted the City's motion for summary judgment and dismissed the *Ricci* plaintiffs' claim. 554 F.Supp.2d at 160-63. The Second Circuit affirmed in a *per curiam* opinion, 530 F.3d 87 (2d Cir. 2008), reasoning that "because the Board, in refusing to validate the exams, was simply trying to fulfill its obligations under Title VII when confronted with test results that had a disproportionate racial impact, its actions were protected." The Supreme Court granted the *Ricci* plaintiffs' petition for certiorari and reversed the Second Circuit. 557 U.S. 557 (2009). The Court held by a 5-4 majority that the City's refusal to certify the exam results was in itself a violation of Title VII's disparate-treatment prohibition, absent some valid defense, which the Court did not discern from the record. The Court concluded that the *Ricci* plaintiffs were entitled to summary judgment on their Title VII claim, and remanded the case. Its decision was dated June 29, 2009. Later in 2009, the City certified the exam results and made promotions. The *Ricci* plaintiffs settled their remaining claims before Judge Arterton.

Briscoe was not promoted, and brought this action against the City, on a disparate-impact theory. This Court dismissed the action on the ground that "What the [Supreme] Court held in *Ricci* and what it said in doing so squarely forecloses Briscoe's claims." 2010 WL 2794212, at *10 (D.Conn. July 12, 2010). The Second Circuit reversed, 654 F.3d 200 (2d Cir. 2011). It held that "[a]fter a careful review of that [*Ricci*] decision and relevant non-party preclusion and Title VII case law, we conclude that Briscoe's claim is neither precluded nor properly dismissed." *Id.* at 209. This Court's dismissal of Briscoe's claim was vacated and the case remanded, with the Court of Appeals'

notation that "we express no view as to whether other issues raised below may warrant dismissal of the action, including relevant statutes of limitations, the doctrine of laches, or the unavailability of the requested relief because of Title VII's anti-alteration provision (42 U.S.C. § 2000e–2( 1 ))." 654 F.3d at 210.

The case was duly remanded to this Court.  The Proposed Intervenors' motion to intervene was granted, which turned them into Intervenors.  These motions to dismiss followed.

## II.

The City and the Intervenors each contend that Briscoe's Title VII discrimination action against the City is barred by the passage of time.  Their theories are different.

Intervenors rely upon the statutory time for filing a Title VII charge with the federal Equal Employment Opportunity Commission ("EEOC").  The charge-filing period is the functional equivalent of a statute of limitations.  "The Court today holds that, for discrete discriminatory acts, § 2000e-5(e)(1) serves as a form of statute of limitations, barring recovery for actions that take place outside the charge-filing period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 123 (2002) (O'Connor, *J.*, concurring in part and dissenting in part)).

Briscoe's failure to assert his claim in a timely fashion, if demonstrated, bars that claim as a matter of law.  The City relies instead upon the equitable doctrine of laches.  Neither the City nor the Intervenors suggest that the other's defensive theory is unsound. One cannot discern from the record a reason why the City prefers an equitable defense and the Intervenors a legal one.  The contentions are not mutually exclusive.  A Title VII claim may be barred by laches even if it was filed and sued upon within the proscribed statutory time limit.

4

I consider the Intervenors' and the City's theories of the case, in that order.

## III.

### A.

The Intervenors contend that the interaction of three cases compels the conclusion that Briscoe's Title VII claim is time barred. Those three cases are *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Lewis v. City of Chicago,* 560 U.S. 205, 130 S.Ct. 2191 (2010); and *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135 (2d Cir. 2012).

In *Morgan*, the Supreme Court held, *inter alia*, that Title VII's requirement that a plaintiff file a charge with the EEOC either 180 or 300 days after the alleged unlawful employment practice occurred "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." 536 U.S. at 105. In *Lewis*, 130 S.Ct. at 2197-99, the Supreme Court interpreted Title VII's language "to mean that every 'use' of an employment practice that causes a disparate impact is a separate actionable violation of Title VII with its own 180- or 300-day statute-of-limitations clock." I have quoted the Second Circuit's paraphrase of *Lewis* in its opinion in *Chin*, 685 F.3d at 158; the Court of Appeals went on to say: "Accordingly, under *Lewis* and *Morgan,* each time the Port Authority failed to promote one of the plaintiffs, that plaintiff had 180 days to challenge the decision." *Id*. Given that Supreme Court authority, the Second Circuit in *Chin,* reversing jury verdicts for certain plaintiffs and remanding the case for a new trial, ended its opinion with the terse instruction: "On remand, individual relief should be awarded only insofar as it corresponds to discriminatory failures to promote committed after August 2, 2000." 685 F.3d at 163. August 2, 2000 was the decisive date because, as the Court of Appeals explained at 685 F.3d 146:

"Accordingly, because the EEOC charge in this case was filed on January 31, 2001, only an unlawful employment practice that 'occurred' after August 2, 2000, may give rise to liability." (footnote omitted).

The Intervenors' theory, as expressed by their counsel during oral argument, is that "*Morgan*, *Lewis* and, most recently, *Chin*, those three cases together I think unambiguously establish a hard and fast bright-line rule," Tr. 98, which precludes Briscoe's Title VII claim as untimely.[2]  It is useful to describe these three cases in greater detail.  I will quote from them at some length, in order to decipher the courts' holdings and reasoning for them.

In *Morgan* the sole plaintiff, Abner J. Morgan, was an African-American former employee of the defendant railroad company, Amtrak.  On February 27, 1995, Morgan filed a charge of discrimination and retaliation against Amtrak with the EEOC, and cross-filed with the California agency.  Morgan alleged in his EEOC charge that during the time period he worked for Amtrak he was "consistently harassed and disciplined more harshly than other employees on account of his race." 536 U.S. at 105.  Such discrimination, Morgan alleged, "began when the company hired him in August 1990 as an electrician helper, rather than as an electrician.  Subsequent alleged racially motivated discriminatory acts included a termination for refusing to follow orders, Amtrak's refusal to allow him to participate in an apprenticeship program, numerous 'written counselings' for absenteeism, as well as the use of racial epithets against him by his mangers."  536 U.S. at 105 n.1.

The Court in *Morgan* summarized its holdings as follows:

_____

[2] During the hearing, the interaction of *Morgan* to *Lewis* to *Chin* was analogized to the double-play proficiency of Tinker to Evers to Chance, the infielders who enabled the Chicago Cubs to dominate major league baseball during the first decade of the 20th century.  The arrival at first base of the batter hitting into the double play was untimely because the ball got there before him.

We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period—180 or 300 days—set forth in 42 U.S.C. § 2000e–5(e)(1). A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period. Neither holding, however, precludes a court from applying equitable doctrines that may toll or limit the time period.

536 U.S. at 122. In the case at bar, we are concerned only with the first of these two holdings. Briscoe's claims against the City relate solely to discrete acts: the preparation of the promotion examination in 2003, and the City's application of that examination's results in 2009, which had the effect of denying Briscoe promotion to lieutenant.

As to that first point of decision, the *Morgan* Court said this:

Title 42 U.S.C. § 2000e–5(e)(1) is a charge filing provision that "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). An individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made. In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days. A claim is time barred if it is not filed within these time limits.

For our purposes, the critical sentence of the charge filing provision is: "A charge under this section *shall be filed* within one hundred and eighty days *after the alleged unlawful employment practice occurred*." § 2000e–5(e)(1) (emphasis added). The operative terms are "shall," "after ... occurred," and "unlawful employment practice." "[S]hall" makes the act of filing a charge within the specified time period mandatory. . . . The requirement, therefore, that the charge be filed "after" the practice "occurred" tells us that a litigant has up to 180 or 300 days *after* the unlawful practice happened to file a charge with the EEOC.

. . .

> A discrete retaliatory or discriminatory act "occurred" on the day that it "happened."  A party, therefore, must file a charge within either 180 days or 300 days of the act or lose the ability to recover for it. . . . [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. [Because] [e]ach discrete discriminatory act starts a new clock for filing charges alleging that act[,] [t]he charge . . . must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. . . . . Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

536 U.S. at 109-110, 113-114 (footnotes omitted).

In *Lewis*, the Court considered a written examination the City of Chicago administered in July 1995 to over 26,000 applicants seeking to serve in the Chicago Fire Department.  After scoring the examination, the City reported the results and on January 26, 1996 issued a press release that it would begin hiring firefighters by drawing randomly from those who scored 89 or above out of 100, a group the City termed "well qualified."  Applicants scoring between 65 and 88 were notified that they had passed the examination and were regarded as "qualified," but it was not likely they would be called for further processing.  Those who scored below 65 were told they had failed the test, were characterized as "not qualified," and would not be further considered.[3]

On May 16, 1996, the City selected its first class of applicants.  It selected a second class on October 1, 1996, and repeated the process nine more times over the next six years.  By the last of these rounds the City had exhausted the pool of "well qualified" applicants, and filled the remaining

---

[3]  The description of the *Lewis* litigation in this and succeeding paragraphs of text is adopted from the Supreme Court's factual account of the case.  *See* 130 S.Ct. 2195-2196.

vacant firefighter slots with "qualified" candidates instead.

On March 31, 1997, an African-American applicant who scored in the "qualified" range and had not been hired filed a charge of discrimination with the EEOC.  Five other similarly situated individuals followed suit.  On July 28, 1998, the EEOC issued all six individuals right-to-sue letters. Two months later they filed a civil action against the City, alleging that the City's practice of selecting for advancement only applicants who scored 89 or above on the July 1995 examination caused a disparate impact on African-Americans, in violation of Title VII.

In the district court, the City sought summary judgment on the ground that the plaintiffs had failed to file the EEOC charges within 300 days after their Title VII claims accrued, which the City contended occurred not later than January 26, 1996, the date of the City's press release announcing its decision to sort firefighter applicants into the three categories of qualification based on their scores in the 1995 examination.  The district court rejected that contention, holding that the City's "ongoing reliance" on the 1995 test results constituted a "continuing violation" of Title VII.  As the case went forward in the district court, the City stipulated that the 89-point cutoff had a "severe disparate impact against African Americans," but argued that the cutoff score was justified by business necessity.  The district court rejected that defense after a bench trial, ruled in plaintiffs' favor, and ordered various forms of remedial relief.

The City appealed and the Seventh Circuit reversed.  528 F.3d 488 (7th Cir. 2008).  In the Court of Appeals' view, "the only discriminatory act" in the case was "sorting the scores into the 'well-qualified,' 'qualified,' and 'not-qualified' categories."  The plaintiffs' action was time barred "because the earliest EEOC charge was filed more than 300 days after" that act.  While the City made actual hiring decisions at later times, they were immaterial to the analysis because "[t]he hiring only

of applicants classified 'well-qualified' was the automatic consequence of the test scores rather than the product of a fresh act of discrimination."  528 F.3d at 491.

The Supreme Court granted certiorari.  Justice Scalia began his opinion for a unanimous Court by recalling that Title VII "requires plaintiffs, before beginning a federal lawsuit, to file a timely charge of discrimination with the Equal Employment Opportunity Commission," and then posed the question presented by the case:

> We consider whether a plaintiff who does not file a timely charge challenging the *adoption* of a practice — here, an employer's decision to exclude employment applicants who did not achieve a certain score on an examination — may assert a disparate-impact claim in a timely charge challenging the employer's later *application* of that practice.

130 S.Ct. at 2195 (emphases in original).  The Court answered that question in the affirmative, reversed the Seventh Circuit, and reinstated most of the plaintiffs' claims.

The *Lewis* Court laid the foundation for its conclusion by defining the nature, the essence, of what the African American firefighter applicants were complaining about.  On that score, the Court said:

> In this case, petitioners' charges were due within 300 days "after the alleged unlawful employment practice occurred."  § 2000e-5(e)(1).  Determining whether a plaintiff's charge is timely thus requires identif[ying] precisely the "unlawful employment practice" of which he complains.  Petitioners here challenge the City's practice of picking only those who had scored 89 or above on the 1995 examination when it later chose applicants to advance.  Setting aside the first round of selection in May 1996, which all agree is beyond the cut-off, no one disputes that the conduct petitioners challenge occurred within the charging period.  The real question, then, is not whether a claim predicated on that conduct is *timely*, but whether the practice thus defined can be the basis for a disparate-impact claim *at all*.

130 S.Ct. at 2197 (internal citation and footnotes omitted).  "We conclude that it can," the Court

declared, promptly answering its own question, and then proceeded to trace the jurisprudential and

legislative development of a disparate-impact claim, ultimately arriving at 42 U.S.C. § 2000e-2(k),

which the *Lewis* Court quoted in part:

> (1)(A) An unlawful employment practice based on disparate impact
> is established under this subchapter only if –
>
>> (i) a complaining party demonstrates that a respondent uses a
>> particular employment practice that causes a disparate impact
>> on the basis of race, color, religion, sex or national origin and
>> the respondent fails to demonstrate that the challenged
>> practice is job  related for the position in question and
>> consistent with business necessity . . . .

Justice Scalia's opinion interprets and construes that part of Title VII in the following extended

passage:

> Thus, a plaintiff establishes a prima facie disparate-impact claim by
> showing that the employer "*uses* a particular employment practice
> that causes a disparate impact" on one of the prohibited bases." *Ibid*.
> (emphasis added). *See Ricci v. DeStefano*, 557 U.S.[557, 577-78],
> 129 S.Ct. 2658, 2672-2673, 174 L.Ed.3d 490 (2009).
>
> Petitioners' claim satisfies that requirement. Title VII does not
> define "employment practice," but we think it clear that the term
> encompasses the conduct of which petitioners complain: the
> exclusion of passing applicants who scored below 89 (until the supply
> of scores 89 or above was exhausted) when selecting those who
> would advance. The City "use[d]" that practice in each round of
> selection. Although the City had adopted the eligibility list
> (embodying the score cutoffs) earlier and announced its intention to
> draw from that list, it made use of the practice of excluding those who
> scored 88 or below each time it filled a new class of firefighters.
> Petitioners alleged that this exclusion caused a disparate impact.
> Whether they adequately proved that is not before us. What matters
> is that their allegations, based on the City's actual implementation of
> its policy, stated a cognizable claim.
>
> . . . Aside from the first round of selection in May 1996 (which all
> agree is beyond the 300-day charging period), the acts petitioners

> challenge – the City's use of its cutoff scores in selecting candidates
> – occurred within the charging period.  Accordingly, no one disputes
> that if petitioners could bring new claims based on those acts, their
> claims were timely.   The issue, in other words, is not *when*
> petitioners' claims accrued, but  *whether* they could accrue at all.

130 S.Ct. at 2197-2198 (emphases in original).[4]  This discussion makes it clear that a discrimination

claim arising out of a selection round occurring beyond the charge-filing time could not "accrue at

all" because it would be untimely.

What stands out in the Court's discussion is the dominant theme, the *leitmotiv*, sounded by

the word "use": as verb or noun.  The word first appears in Title VII itself: "the respondent *uses* a

particular practice that causes a disparate impact."  The quoted portion of the *Lewis* opinion contains

variations on that theme: "the City '*use[d]*' that practice in each round of selection"; "it made *use* of

the practice of excluding those who scored 88 or below"; "the City's *use* of its cutoff score in

selecting candidates."  I have added the emphases, but they are not needed to make the point.[5]  The

Supreme Court's fastening upon the *application* of scoring-based hiring exclusions as the prohibited

discriminatory *use*, rather than the *adoption* of that practice, explains the Court's rejection of the

City's and Seventh Circuit's notion that "the only actionable discrimination" occurred in 1996, when

the City "used the examination results to create the hiring list, limited hiring to the 'well qualified'

classification, and notified petitioners," so that subsequent to that moment in time "no new violations

could have occurred."  130 S.Ct. at 2198.  The Court rejected that perception for this reason:

---

[4] The Court's citation in the quoted discussion to its prior decision in *Ricci* has a particular
resonance: there are those involved in the continuing litigation at bar who may regard *Ricci* as "the
source of all our woes."

[5]  To  paraphrase  the despairing Othello, act 5, scene ii, line 1: "It is the use, it is the use,
my soul."

The City's premise is sound, but its conclusion does not follow. It may be true that the City's January 1996 decision to adopt the cutoff score (and to create a list of the applicants above it) gave rise to a free-standing disparate-impact claim. Cf. *Connecticut v. Teal*, 457 U.S. 440, 445-451, . . . (1982). If that is so, the City is correct that since no timely charge was filed attacking it, the City is now "entitled to treat that past act as lawful." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). But it does not follow that no new violation occurred – and no new claims could arise – when the City implemented that decision down the road. If petitioners could prove that the City "use[d]" the "practice" that "causes a disparate impact," they could prevail.

130 S.Ct. at 2198-2199.

After the Supreme Court handed down its decisions in *Morgan* and *Lewis,* the Second Circuit decided the third case upon which Intervenors rely: *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2012). Plaintiffs in *Chin* were eleven Asian American present or former police officers employed by the Port Authority. They sued the Port Authority under Title VII, alleging that they were passed over for promotions because of their race. The plaintiffs asserted three theories of discrimination: individual disparate treatment, pattern-or-practice disparate treatment, and disparate impact. After trial, a jury found for seven plaintiffs under all three theories and awarded back pay and compensatory damages; the district judge awarded various forms of equitable relief to certain of the prevailing plaintiffs. The Port Authority appealed on a number of grounds and issues; for purposes of the case at bar, I am concerned only with the Second Circuit's holdings on the disparate impact aspect of *Chin*.

In that regard, the Second Circuit held that the district court erred in "concluding that the 'continuing violation' doctrine applied to the plaintiffs' disparate impact theory so that the jury could award back pay and compensatory damages for harms predating the onset of the statute of

13

limitations." 685  F.3d at 141.  The Court of Appeals fixed the limitations period in the case by

stating: "Accordingly, because the EEOC charge in this case was filed on January 31, 2001, only an

unlawful employment practice that 'occurred' after August 2, 2000, may give rise to liability."  *Id*.

at 146 (footnote omitted).[6]  *Chin* cites *Morgan* for the proposition that "an employer's failure to

promote is by its very nature a discrete act," and goes on to hold:

> Accordingly, under *Morgan*, every failure to promote is a discrete act
> that potentially gives rise to a freestanding Title VII claim with its
> own filing deadline.
>
>   Discrete acts of this sort, which fall outside the limitations period,
> cannot be brought within it, even when undertaken pursuant to a
> general policy that results in other discrete acts occurring within the
> limitations period.

*Id*. at 157.

In *Chin*, the Second Circuit held that the timeliness of a Title VII failure-to-promote

discrimination depended solely and entirely upon the statutory limitations protocol.  The Court of

Appeals reached that conclusion because it read *Morgan* and *Lewis* to mandate it.  The *Chin* court

said:

> To  prevail  on a  disparate impact claim, a plaintiff must
> "demonstrate[ ] that a respondent *uses a particular employment
> practice that causes a disparate impact*."  42 U.S.C. § 2000e-
> 2(k)(1)(A)(i) (emphasis added).  In *Lewis v. City of Chicago*, [560]
> U.S. [205], 130 S.Ct. 2197, 2197-99, 176 L.Ed.2d 967 (2010), the
> Supreme Court interpreted this language to mean that every "use" of
> an employment practice that causes a disparate impact is a separate
> actionable violation of Title VII with its own 180- or 300-day statute-
> of-limitations clock.  *See id*.  at 2197-99.  Accordingly, under *Lewis*
> and *Morgan*, each time the Port Authority failed to promote one of
> the plaintiffs, that plaintiff had 180 days to challenge the decision.

---

[6]  *Chin* was a 180-day case, not a 300-day case.

14

> In an attempt to distinguish *Morgan*, the plaintiffs argue that they "challenge *the process* by which the Port Authority made promotion decisions, rather than any specific promotion decision." Appellees' Br. at 29. But this argument hurts rather than helps them. In *Lewis*, the Supreme Court considered the case of an allegedly discriminatory examination used by the City of Chicago to make hiring decisions. The examination's scores and the City's plan to hire based on certain cutoff scores were announced outside the limitations period, but the actual hiring occurred within the limitations period. *See Lewis*, 130 S.Ct. at 2195-96. The Supreme Court explained that although "[i]t may be true that the City's . . . decision to adopt the cutoff score (and to create a list of the applicants above it) gave rise to a freestanding disparate-impact claim[,] [i]f that is so, the City is correct that since no timely charge was filed attacking it, the City is now entitled to treat that act as lawful." *Id*. at 2198-99 (citation and internal quotation marks omitted). If the process by which the Port Authority promoted police officers from its eligibility lists did not materially change within the limitations period, as the plaintiffs claim, then the Port Authority is entitled to treat the process as lawful. *See id*. at 2199. The process itself therefore cannot be challenged; rather, only specific failures to promote that occurred within the limitation period are actionable.

685 F.3d at 158.

In case any of its readers had not yet gotten the message, the Second Circuit ended its opinion in *Chin* with these terse instructions:

> We remand all of these remedies issues to the district court for a new trial solely on damages and for the reconsideration of equitable relief. On remand, individual relief should be awarded only insofar as it corresponds to discriminatory failures to promote committed *after August 2, 2000.*

685 F.3d at 163 (emphasis added). As previously noted, August 2, 2000 was the beginning of the statutory limitations period: 180 days before the filing of the first EEOC charge on January 31, 2001.

These three cases – *Morgan*, *Lewis* and *Chin* – declare the law binding upon this Court with respect to the timeliness of Plaintiff Briscoe's Title VII claim against the City of New Haven. It is

now necessary to examine the time line of events relevant to Briscoe's claim.

### B.

The time line of events relevant to Briscoe's claim begins with this case's Book of Genesis: the examinations which during the year 2003 the City administered to determine eligibility for promotion to the positions of lieutenant and captain in the New Haven Fire Department.[7]

In November and December, 2003, candidates took the examinations for promotion. Plaintiff Michael Briscoe was one of them. Seventy-seven candidates completed the lieutenant examination: 43 Caucasians, 19 African-Americans, and 15 Hispanics. Of those, 34 candidates passed: 25 whites, 6 blacks, and 3 Hispanics. When Briscoe's overall score was completed, he ranked 24th among the 77 candidates for promotion to the position of lieutenant. Eight lieutenant positions were vacant at the time of the examination. By reason of a City Charter provision that the hiring authority must fill each vacancy by choosing one candidate from the top three scorers on the list, the top 10 candidates were eligible for immediate promotion to lieutenant. All 10 were white. Similarly, as a result of the test scores, no African-American candidates were eligible for promotion to captain.

On March 18, 2004, the Civil Service Board of the City, which was required to certify the results of the examinations, voted not to certify them.[8] City officials had asked the Board to hold public hearings on whether to certify, because those officials were concerned that promotions based

---

[7] The dates, events and facts set forth in this and succeeding paragraphs are taken from District Judge Arterton's opinion in *Ricci v. DeStefano*, 524 F.Supp.2d 142 (D.Conn. 2006); the Supreme Court's opinion in that case, 557 U.S. 557, 129 S.Ct. 2658 (2009); and exhibits submitted with motions in the case at bar.

[8] Two members of the Board voted to certify the results of the 2003 examinations and two members voted not to certify. The fifth member of the Board had recused himself. Certification required a majority vote in favor, and so the 2003 examination results were not certified.

on the examination results would violate Title VII by causing a disparate impact on African-American candidates.  During the public debate before the Civil Service Board, which the Supreme Court characterized as "rancorous," 129 S.Ct. at 2664, some firefighters argued that the tests should be discarded because the results showed them to be discriminatory. They threatened a discrimination lawsuit if the City made promotions based on the tests.  Other firefighters defended the examination as neutral and fair, and in turn threatened a discrimination lawsuit if the City, relying on the statistical racial disparity, ignored the test results and denied promotions to the candidates who had performed well.  In the event, the City took the side of those who protested the test results, and with the complaisant vote of the Civil Service Board, threw out the examinations.

On July 8, 2004, one Hispanic and 19 Caucasian candidates, all of whom had high marks on the examinations, filed suit in this Court against the City and some of its officials.  The first-named plaintiff, Frank Ricci, by reason of that fortuity gained what passes in some circles for immortality: lawyers and judges now speak of "the Ricci plaintiffs."  The Ricci plaintiffs alleged that, by discarding the test results, the City and its officials discriminated against the plaintiffs based on their race, in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment.  The City and the officials defended their actions, arguing that if they  had certified the results, they could have faced liability under Title VII for adopting a practice that had a disparate impact on the minority firefighters seeking promotion.  The case was assigned to District Judge Arterton.

On September 28, 2006, Judge Arterton filed an opinion which granted the defendants' motion for summary judgment, denied the Ricci plaintiffs' cross-motion for summary judgment, and directed the Clerk of Court to close the case.  554 F.Supp.2d 142.  The Second Circuit affirmed in a brief *per curiam* opinion.  530 F.3d 87.  The Supreme Court granted certiorari.

17

On June 29, 2009, the Supreme Court filed its opinion, which held that the Ricci plaintiffs "are entitled to summary judgment on their Title VII claim, . . . [t]he judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion." 129 S.Ct. at 2681.  The Second Circuit, having been reversed, issued its mandate to this Court, where it again came to rest in the chambers of Judge Arterton, who reopened the case for the principal purpose of determining appropriate remedies for the now-successful Ricci plaintiffs.

On October 2, 2009 or October 5, 2009, Briscoe filed a sworn Charge of Discrimination form with the Waterbury office of the State of Connecticut Commission on Human Rights and Opportunities ("CHRO")[9] [Doc. 237-2].  By checking the appropriate box, Briscoe indicated that the "cause of discrimination" was "based on Race," and that it was "continuing."  On the page of the form directing the complainant to provide "particulars" for "each specific allegation," Briscoe wrote:

> The City of New Haven is about to certify a promotional employment list for the position of fire lieutenant.  My position on the list (24) is much lower than it should be.  The reason is a selection process that discriminates against African American candidates, in violation of Title VII of the Civil Rights Act of 1964, as amended. The promotional examination was not job related and had a disparate impact and the system for weighting the two components of the test, oral and written, was not job related and had a disparate impact.

On October 9, 2009, the CHRO sent a letter bearing that date to David N. Rosen, Esq., counsel for Briscoe, who presumably participated in Briscoe's delivery of his October 2 Charge of Discrimination to the agency.  The letter [Doc. 237-3] reads in its entirety:

> Dear Attorney Rosen:

---

[9] The CHRO form signed by Briscoe is dated October 2, 2009.  The agency's stamp signifying receipt is dated October 5, 2009.  This discrepancy is not material to any issue in the case. One supposes that Briscoe or his attorney mailed the form from New Haven on October 2 and the agency received it in Waterbury on October 5.

> I am returning the affidavit and additional paperwork you sent to our office on the on behalf of [*sic*] the above named individual.
>
> We are unable to accept the affidavit since no the [*sic*] event alleged, denial of promotion, has not yet occurred.  The allegations made in the affidavit were discussed with the Regional Manager, Pekah Wallace, before this determination was made.
>
> If you would like to discuss this matter further, feel free to contact.

The letter was signed by Kathleen Bowden Garassino, identified as an "Investigator."

Also under date of October 2, 2009, Briscoe filed an Intake Questionnaire with the EEOC, whose Boston Area Office stamped the document as received on October 5 [Doc. 237-4]. Submitting this questionnaire is the manner in which an individual files a discrimination claim with the EEOC.   Question 5 asks the individual: "What happened to you that you believe was discriminatory?  Include the date(s) of harm, action(s) and include the name(s) and title(s) of the persons who you believe discriminated against you."  A claimant's response to that overall question is structured by a series of sub-questions, captioned "Date," "Action" and "Name and title of Person(s) Responsible."  Briscoe responded to those inquiries by stating, respectively: "Continuing," "Not promoted," and "City" ( a reference, other parts of the document make clear, to the City of New Haven).

It is common ground that shortly after Briscoe filed his EEOC claim, his counsel asked the United States Department of Justice to issue a right to sue letter.[10]  The Department complied, and

---

[10]   Mr. Rosen described that part of the process development during oral argument (Tr. 153):

> The Department of Justice, unlike the state agency, did not say, [w]e had filed it too soon.  They did what they commonly do.  I've been doing this for a while myself.  What they commonly do on request or sometime on their own, they say, ["]Look, we're not going to be able to have our investigation and so on within the 180 day period.  So,

sent a right to sue letter dated October 27, 2009 [Doc. 237-5] to Briscoe in counsel's care, signed on behalf of the Assistant Attorney General in charge of the Civil Rights Division. The letter recites in what appears to be boilerplate language that the EEOC "has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge," and goes on to say that "because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended" against "the above-named respondent," namely the City of New Haven. The letter concludes with the standard bureaucratic disclaimer: "This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious."

On October 15, 2009, Briscoe filed his initial complaint in this action [Doc. 1]. The complaint focused upon and criticized the 2003 New Haven fire lieutenant examination. Specifically, the complaint alleged that the City's choosing "to weight the written test 60 percent and the oral exam 40 percent . . . had a disparate impact on African-American candidates; and it will prevent the plaintiff from being promoted to the rank of lieutenant, even though he is one of the most highly qualified candidates." ¶ 1. This conduct on the part of the City is alleged to have violated Title VII.

On November 24, 2009, in the *Ricci* case pending before her, Judge Arterton issued an Order directing that Judgment be entered for the plaintiffs on their disparate-treatment claim under Title

_____

since you have requested a right to sue letter, we'll give you one.["]

In this case, the Department of Justice was responsible for issuing a right to sue letter, rather than the EEOC, because the respondent City of New Haven is a governmental agency. *See* 29 C.F.R. § 1601.28(d).

VII; that the New Haven Civil Service Board certify the results of the 2003 examinations and certify the promotion lists for each position derived from the examination results; and that the City immediately promote eight named firefighters to the rank of Lieutenant.  Briscoe was not one of these.  Following remand to the District Court, the litigants, thus refreshed, renewed brisk adversarial exchanges, and at one point Judge Arterton contemplated deferring final judgments until the quantum of each claim had been tried on its merits.  However, it was represented to the Court that there was an urgent need to fill the vacancies for fire lieutenants and captains, a need which the November 24, 2009 Order and Judgment addressed.

What happened next does not seem to be in dispute.  According to the City's brief [Doc. 224-1] at 5, "[t]he City's Charter dictates that the eligible [promotion] lists are to be effective for a period of up to two years.  Accordingly, had the eligible lists been certified in the ordinary course, the lists would have been effective from March 18, 2004 through March 18, 2006."  During that two-year period, there was an increased total of 16 vacancies for the position of lieutenant.  In obedience to Judge Arterton's November 24, 2009 Order and Judgment, the City, acting through the New Haven Board of Fire Commissioners, promoted to lieutenant the 16  candidates with the highest overall scores on the 2003 examination.  On December 1, 2009, the City promoted 8 candidates, and in a second round of selection several days later promoted another 8 candidates to lieutenant, thus filling all 16 then-existing vacancies.  Briscoe was not among the promoted candidates because his overall score on the examination was not high enough.  The City, with no further use for 2003 exam results and promotion lists, whose effective dates had expired in any event, discarded them.

Following these promotions to lieutenant, which were based upon the 2003 examination scores and excluded him, Briscoe has not filed a Title VII discrimination claim with either the

CHRO or the EEOC.  He continues to press this action, having most recently obtained leave of Court to file a Third Amended Complaint, which adds to the federal claim a pendent claim alleging violations of the New Haven City Charter and Civil Service Rules.

## C.

It clearly emerges from the statute and the cited  cases that a Title VII discrimination claim accrues and becomes actionable when a respondent employer "*uses* a particular employment practice that causes a disparate impact on the basis of race" or other proscribed bases, and that practice is not job related and consistent with business necessity.  I have quoted the statute, but all these cases speak in the same tongues and terms.  In consequence, if an individual is discriminated against by an employer's *use* of an employment practice (such as an examination) with adverse effect upon the individual (such as denial of employment or promotion), and that use occurred within the proscribed period before the EEOC charge is filed (180 days or 300 days, as the case may be), then a subsequent Title VII action in the district court will be timely.  Conversely, if the employer's use of the practice occurred outside the charging period, any subsequent legal action would be time barred.

In the case at bar, Michael Briscoe aspired to fill one of the then existing vacancies for the position and rank of lieutenant in the New Haven Fire Department.  Those vacancies remained unfilled until shortly after November 24, 2009, the date of Judge Arterton's Order and Judgment in the *Ricci* case directing the City to certify the promotion list and fill the vacancies.  The 16 lieutenant vacancies were filled by promotions announced in November and December 2009.  Whatever qualms or misgivings Briscoe might have felt about his personal prospects as the result of earlier administrative or litigation developments, not until those moments in November and December of

2009 did the use of the examination test results Briscoe challenges as discriminatory subject him to the bitter disappointment of denial of promotion.  The City continues to press its contention that for Title VII purposes, it did not "use" the 2003 exam results as the basis for promotion, because the Supreme Court told it to do so.  I reject that contention: *use* is *use*, whether as joyful choice or in sullen compliance.  However, the question is irrelevant to that of whether Briscoe's lawsuit is timely under the statutory scheme.

The case for the Intervenors is simple  enough:   in their perception, Briscoe's claim *au fond* is that the City's refusal to promote him was tainted by racial discrimination.  That denial of promotion did not occur until the first week in December, 2009.  Briscoe had 300 days from that occurrence to file a discrimination claim with the EEOC.  That time limitation is imposed by section 706 of Title VII, 42 U.S.C. § 2000e-5(e)(1), which provides that with respect to a claim initially presented to a State agency such as the CHRO, a charge "shall be filed" with the EEOC "by or on behalf of the person aggrieved within three hundred days *after* the alleged unlawful employment practice *occurred . . .* " (emphases added).  Since Briscoe has never filed an EEOC charge after the promotions were made, the present suit is time barred.

To avoid time bar, Briscoe must perforce rely upon the only administrative claims he *did* file.  There are two of them.  The first is the CHRO form Briscoe signed on October 2, 2009, which that State agency received on October 5.  The second is the claim Briscoe filed simultaneously with the EEOC, a practice that the regulatory  scheme allows.  In the form Briscoe filed with the CHRO, he checked a box which said: "I also want this charge filed with the EEOC."  It is necessary to consider the nature and disposition of these claims.

The language of Title VII and the cases interpreting it show that to be viable, an individual's

charge of discrimination must identify the employment practice alleged to be discriminatory. Briscoe's briefs and counsel's oral submissions purport to identify two employment practices on the part of the City whose disparate impact harmed Briscoe.

First, Briscoe's brief [Doc. 239-1] contends at 8-9 that "New Haven's decision to certify the list and make promotions from it, in compliance with the Supreme Court's *Ricci* ruling, constituted an employment practice within the meaning of Title VII. . . .  Here the decision occurred when New Haven decided to certify the lists as early as June 29, 2009, and in any event before October 5, 2009."  June 29, 2009 is the date of the Supreme Court's *Ricci* decision, which conveyed to the City the unwelcome news that it could not discard the results of the 2009 examinations.  While the City's decision to certify the lists and base promotions on them necessarily occurred on June 29 or some later date, June 29 itself is less than 300 days before Briscoe's October 5 charge-filing date with the CHRO.  If one accepts the characterization of this decision by the City as a discriminatory employment practice, it follows, as Briscoe contends, that his filing of a charge on October 5, 2009 was timely under Title VII.

As a second, additional or alternative theory, Briscoe appears to contend in a footnote that "the City's November 30 [2009] certification and its December promotions *also* constituted uses of an employment practice, within 300 days of which a plaintiff could file an EEOC charge, even though the decision to make promotions was the original trigger."  Brief, Doc. 239-1, at 9 n. 4 (emphasis added).  In support of that concept of timeliness, Briscoe argues that since, in contrast to a disparate treatment claim, a disparate impact claim requires no showing of an employer's intent to discriminate, "any discrete act or use of an employment practice starts its own 300-day limitations period, whether that employment practice is an inevitable decision to certify exam results or the

24

inevitable effects of that decision, such as promotions from a previously certified list." *Id*. That concept does not operate to render Briscoe's administrative filings timely *ex proprio vigore*, since Briscoe has not filed any administrative claim *after* "the City's November 30 [2009] certification and its December promotions" started the 300-day clock running. Briscoe's argument must be that the City's discrete acts in November and December of 2009 have a salutary effect upon the meaning, effect and timeliness of administrative claims Briscoe filed during the preceding October.

Briscoe's principal contention on timeliness turns upon the October 5, 2009 CHRO and EEOC filings. That reliance is problematic because the State agency did not regard Briscoe's submission as stating an appropriate or viable claim for discrimination. Instead, the CHRO mailed the form back to Briscoe's counsel, with this explanation: "We are unable to accept the affidavit since no the [sic] event alleged, denial of promotion, has not yet occurred." Doc. 237-3. The agency's communication must be graded F for grammar, but A for clarity. The CHRO is unmistakably expressing its view that until the discrete act of a denial of promotion actually occurred, Briscoe did not have a claim for discrimination sufficient to fall within Title VII or the agency's competence to even receive Briscoe's affidavit, let alone act upon it. Briscoe's complaint to the CHRO began with, and is encapsulated by, these first two sentences: "The City of New Haven is about to certify a promotional employment list for the position of fire lieutenant. My position on the list (24) is much lower than it should be." The CHRO responded, in substance: "Not our business yet. If later on you are denied promotion, and you think it was discriminatory, file a form and we'll consider the claim." Counsel for the parties are now devoting their very considerable skills, and the Court is expending such resources as it has, upon the question of time bar because Briscoe,

having been denied promotion never filed a further CHRO/EEOC charge.[11]

In short, the CHRO regarded Briscoe's October 2, 2009 submission as a nullity, and sent it back to him.  The briefs for Briscoe on this motion do not argue explicitly that in doing so, the CHRO acted improvidently or in derogation of its responsibilities.  But it seems to me that Briscoe must take that position, even if implicitly, notwithstanding the deference which courts customarily extend to the decisions and practices of a specialized agency such as the CHRO.  To state the proposition differently, this Court has to decide whether Briscoe's October 2, 2009 filing with the CHRO, describing the City's  selection process for promotions to be made in the future, gave rise to a then-existing freestanding disparate-impact claim, which the CHRO wrongfully returned rather than retained.

Counsel for Briscoe seems to discern support and comfort on this point in the reaction of the federal EEOC and Department of Justice to the claim Briscoe filed with the EEOC simultaneously with his CHRO filing.  As noted in footnote 10, *supra*, counsel said during oral argument on the motion: "The Department of Justice, *unlike the state agency*, did not say, We had filed it too soon." (emphasis added).  If counsel's quoted distinction is intended to suggest that the "state agency" acted improperly in its response to Briscoe, and the Department of Justice, in contrast, arrived at a reasoned decision on the viability of an October 2 pre-promotion denial discrimination claim, the vessel is too frail to  transport the intended cargo.  The Department's right-to-sue letter, dated October 27, 2009, recites that Briscoe's counsel requested the letter shortly after the claim was filed, with no time or opportunity for the federal agency to do anything except accede to Briscoe's request,

---

[11]   At some level, counsel for Briscoe may regret never having done so, but no matter: we take the case as we find it.

produce a right-to-sue letter from its word processor, and send it off.  Briscoe's relations and objectives with the federal agencies related solely to form.  No substance can fairly be derived from Briscoe's abbreviated stop at the federal way-station.

Reverting to Briscoe's CHRO filing, there is scant recent authority on the question of whether it presented a cognizable claim under Title VII.  Briscoe's affidavit to the CHRO *anticipated* that the City "is about to certify" a promotional list which was the product of "a selection process" and a "promotional examination" that Briscoe asserted to be discriminatory.  Once promotions were actually made, and Briscoe was denied promotion, a discrete adverse employment decision occurred which was actionable under Title VII if not time barred.  That is the core holding of *Morgan*, *Lewis* and *Chin.*

But does the City's earlier and preliminary determination (coerced as it may have been by *Ricci*) to certify the lists and make promotions based upon the 2003 examination results give rise to a viable Title VII claim?  The Supreme Court came close to answering that question in *Lewis*. Notably, in *Lewis* the City of Chicago, defending against a Title VII claim on behalf of unsuccessful fire department applicants, argued that the *only* actionable discrimination occurred when the City used examination results to create hiring eligibility lists and that, "because no timely charge challenged the decision, that cannot now be the basis for liability." 130 S.Ct. at 2198.  The Court accepted the City's premise that "the exclusion of petitioners when selecting classes of firefighters followed inevitably from the earlier decision to adopt the cut-off score," but rejected the City's conclusion that "no new violation occurred – and no new claims could arise – when the City implemented that decision down the road."  *Id*. at 2199.  During its discussion, the Court said:

> *It may be true* that the City's January 1996 decision to adopt the

27

> cutoff score (and to create a list of the applicants above it) gave rise
> to a freestanding disparate-impact claim.  Cf. *Connecticut v. Teal*,
> 457 U.S. 440, 445-451 (1982).

130 S.Ct. at 2198-2199.

While the phrase "it may be true" has about it the ring of dicta rather than a holding, the case the Court cited for the quoted proposition, *Connecticut v. Teal*, is instructive.  *Teal* involved a selection process for promotion to permanent status as supervisor in a state agency.  The process "required, as the first step, a passing score on a written examination."  457 U.S. at 443.  The plaintiffs, four black employees of the agency, "were among the blacks who failed the examination, and they were thus excluded from further consideration for permanent supervisory positions."  *Id.* at 443-444.  Plaintiffs' complaint alleged that the state employer "violated Title VII by imposing, as an absolute condition for consideration for promotion, that applicants pass a written test that excluded blacks in disproportionate numbers and that was not job related."  *Id.* at 444.

The Court held in *Teal* that the employer's "affirmative-action program in order to ensure a significant number of minority supervisors," by means of a promotional process with the "bottom-line" result of an appropriate racial balance, did not preclude plaintiffs from establishing a prima facie case of disparate impact discrimination, nor did it provide the employer with a defense to such a case.  457 U.S. at 442.  While that specific holding is not applicable to the case at bar, the *Teal* Court's analysis of the nature of the plaintiffs' Title VII disparate-impact claim is instructive:

> Title VII proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.  The touchstone is business necessity.  If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. . . . The statute speaks, not in terms of jobs and promotions, but in terms of *limitations* and *classifications* that would deprive any individual of employment *opportunities*. . . .

28

> [Plaintiffs'] claim of disparate impact from the examination, a pass-fail barrier to employment opportunity, states a prima facie case of employment discrimination under § 703(a)(2), despite their employer's nondiscriminatory "bottom line," and that "bottom line" is no defense to this prima facie case under § 703(h).

*Id*. at 446, 448, 452 (citations, internal quotation marks, and footnotes omitted).

In *Teal,* the Court concluded that an employer's promotion selection process, keyed to an examination with disparate impact effect, gave rise to a prima facie Title VII claim.  In *Lewis,* the Court cited *Teal* as a basis for suggesting that the City of Chicago's "January 1966 decision to adopt the cutoff score (and to create a list of the applicants above it)" might give rise "to a freestanding disparate-impact claim."  130 S.Ct. at 2199.  In *Chin*, the Second Circuit cited *Lewis* for the proposition that "[i]f the process by which the Port Authority promoted police officers from its eligibility lists did not materially change, within the limitations period, as the plaintiffs claim, then the Port Authority is entitled to treat the process as lawful."  685 F.3d at 158.

These three cases hold (*Teal*) or suggest (*Lewis* and *Chin*) that a promotion process with a demonstrable disparate-impact effect may give rise to a Title VII claim *before* the process is implemented to deny promotion or hiring to a particular individual.  In the case at bar, that appears to be the sort of Title VII claim Briscoe asserted in his filing with the CHRO.  Briscoe complained of "a selection process that discriminates against African American candidates, in violation of Title VII," because "the promotional examination was not job related and had a disparate impact."  I am unable to discern any basis for distinguishing Briscoe's claim from the claims of the *Teal* plaintiffs that the Supreme Court held stated a prima facie Title VII case; and the Court cited *Teal* in *Lewis* to suggest that if an African-American firefighter applicant had complained at the time of Chicago's decision to adopt the promotion process in question, he would have stated "a freestanding disparate-

impact claim."  In point of fact, no plaintiff in either *Lewis* or *Chin* challenged the selection processes when the employers decided upon them; but Briscoe has done so.

While I owe a certain deference to the CHRO's decision to reject Briscoe's Title VII claim as premature, I am not bound by the agency's action.  The holdings and reasoning of the cited cases lead me to conclude that Briscoe's October 5, 2009 filing with the CHRO stated a viable claim of a Title VII violation on the part of the City of New Haven.[12]  That charge was timely filed, because the City's decision to use the examination results and certify the resulting promotion lists could not have occurred earlier than June 29, 2009, the date of the Supreme Court's decision in *Ricci*. Subsequently, Briscoe obtained a right-to-sue-letter from the Department of Justice and filed this action.  The Intervenors' motion to dismiss Briscoe's complaint on the ground that it is time barred will be denied.

**IV**.

The City does not press a statute of limitations ground for dismissal, although it does not oppose the Intervernors' doing so.  Rather, the City relies upon the equitable principle of laches.

Briscoe responds that laches is not applicable in any case where a plaintiff has sued within the relevant limitations period.  For the reasons stated in Part III.C., Briscoe filed a Title VII charge and commenced an action upon it within the statutory limitations period.  But his premise is wrong. Laches is still available as a defense to the City, if the facts sustain it.

In *Morgan* the Supreme Court, after holding that with respect to "each discrete

---

[12]  The Intervenors' reliance upon the *Morgan-Lewis-Chin* trilogy is understandable, but there is nothing in those decisions to negate the interpretation and effect given in text to Briscoe's CHRO filing.

discriminatory act" an administrative charge "must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred, went on to say:

> As we have held, however, this time period for filing a charge is subject to equitable doctrines such as tolling or estoppel.  We hold that a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.  Courts may evaluate whether it would be proper to apply such doctrines, although they are to be applied sparingly.  Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.

536 U.S. at 113-114 (citations and internal quotation marks omitted).  Later in the opinion, the Court said that nothing in its statute of limitations holding "precludes a court from applying equitable doctrines that may toll *or limit* the time period."  *Id*. at 122 (emphasis added).

Briscoe's brief seeks to confine this language from *Morgan* to circumstances present in that case but not in the case at bar.  The effort does not persuade.  Whatever the circumstances of a case may be, the elements of laches remain the same: delay by a plaintiff, resulting in prejudice to a defendant.  Within the context of a statute of limitations, Judge Friendly articulated the appropriate formula in *Larios v. Victory Carriers, Inc.*, 316 F.2d 63 (2d Cir. 1963):

> [I]n deciding whether maritime claims are barred by laches, courts of admiralty will use local limitation statutes as a rule-of-thumb . . . This seems to put it right.  When the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it should not be.

316 F.2d at 66 (internal quotations and citation omitted).  *Larios* fell within admiralty jurisdiction, traditionally governed by equitable principles. Judge Friendly's formula, which asks in essence what

is fair in the case, extends naturally to non-maritime cases, and I apply it in the case of Briscoe's discrimination claim against the City.

Briscoe's brief argues that a later Second Circuit case, *United States v. Milstein*, 401 F.3d 53 (2005), stands for the general proposition that laches is not available where an applicable statute of limitations has not run. *Milstein* is not apposite. It was a criminal case, in which the convicted defendant argued on appeal that the trial judge should have instructed the jury on the doctrine of laches. The Second Circuit rejected the appeal, reasoning that "the relevant statute of limitations, as well as the speedy trial safeguards of the Due Process Clause, serve to protect a defendant's interests against unreasonable delay," and concluding: "We have found no case applying a laches defense in the criminal context." *Id*. at 63. Whatever else may be said about the case at bar, it is not a criminal case, and *Milstein* furnishes no guidance with respect to it.

While I conclude that laches is available to the City even if Briscoe filed his action within the applicable statute of limitations, I also conclude that this case is not an appropriate one for dismissing Briscoe's suit on the ground of laches. It is of course true that a considerable amount of time elapsed between the City's formulation of the promotion examination in question and the filing of Briscoe's complaint challenging it. However, the relevant litigation history, of which Briscoe's suit constitutes only a part, has evolved and continues to evolve in a topsy-turvy fashion, with pendulum-like alternating fortunes on the part of members of the affected universe, New Haven firefighters seeking promotion. It is fair to say that certain minority firefighters (including Briscoe) may have been cast down by the results of the City's 2003 examination;  lifted up by the City's decision to disregard those results; lifted up again when Judge Arterton and then the Second Circuit rejected white firefighters' challenge to the City's decision to disregard the results; and then cast

down again when the Supreme Court reversed and held the City could not do that.  This setting reminds one of that "darkling plain" in *Dover Beach*,  "Swept with confused alarms of struggle and flight, Where ignorant armies clash by night" (although I do not suggest that the poet would regard the courts involved this case as "ignorant armies').[13]  The point on laches is that while the City argues at length that Briscoe could or should have done something he did not do, or did not do something he should have done, the City does not sufficiently identify litigation conduct on Briscoe's part, during this tangled history, so lacking in procedural health that it must be condemned as unreasonable delay for laches purposes.

Nor can the City point to prejudice specifically caused by any delay fairly attributable to Briscoe.  In human terms, it is difficult not to sympathize with the City, which acted in good faith and for arguably praiseworthy reasons in deciding initially to disregard the 2003 examination results. "No good deed," the City may be forgiven for reflecting with some bitterness, "goes unpunished." The City's life would be less complicated if Briscoe had never appeared on the litigation scene or could be made to go away.  But this is not the sort of prejudice of which laches speaks.  The City may think itself prejudiced by Briscoe's presence as a litigant, but laches requires a more particularized showing by a defendant, who must demonstrate that its defense against the merits of the claim was prejudiced by the plaintiff's unreasonable delay in asserting it.  Prejudicial effect upon a defendant's quality of life will not suffice, but that is all I can discern in the case at bar.

For these reasons, the City's motion to dismiss Briscoe's complaint on the ground of laches, not pressed by Intervenors but not opposed by them,  will be denied.

---

[13]  The poet in question is Matthew Arnold (1822-1888).

**V.**

**A.**

Points III and IV considered the contentions of the City and the Intervenors that Briscoe's Title VII action against the City was time barred, on one theory or another.  The Court rejected those contentions.  I turn now to the substance of Briscoe's claim.  The City and the Intervenors join in contending that the claim fails as a matter of law, and must be dismissed for that reason.  Briscoe defends the sufficiency and viability of his claim.

Briscoe's claim is that stated in his Third Amended Complaint ("TAC") [Doc. 199-2], the operative pleading in the case, filed on September 6, 2012.  Even after  exhaustive rounds of briefs and extended oral arguments on the present motions to dismiss, the meaning and nature of Briscoe's Title VII claim continue to be debated in post-argument briefs: Docs. 252, 253, 255, 256, 257, 258, 264, 269, 270, 276, 277, 279.  It is almost as if, despite the death of Admiral Lord Nelson long ago, surviving English and French ships of the line at the Battle of Trafalgar continue to exchange broadsides.  This Ruling focuses, as the Court must and the parties should, upon the Title VII claims Briscoe included in his CHRO and EEOC charges, and now pleads in the TAC.

The TAC begins with a paragraph (¶ 1) captioned "**INTRODUCTION**," which summarizes Briscoe's underlying claim.  It reads in full:

> The 2003 New Haven fire lieutenant examination had two parts: a multiple-choice written test and an oral exam.  Ranking on the eligibility depended on how the City chose to weight the scores on the two components.  The oral exam was a better way to assess candidates' skills and abilities than the written test and had less disparate impact on African-Americans.  Yet the City chose to weight the written test 60 percent and the oral exam 40 percent.  This weighting reduced the validity of the overall selection process; it was arbitrarily chosen, without any pretense that it was job related; it was

34

contrary to standard practice among similar public safety agencies, where the norm is to weight the oral component 70 percent; it had a disparate impact on African-American candidates; and it prevented the plaintiff from being promoted to the rank of lieutenant, even though he was one of the most highly qualified candidates.

With ¶ 5 of the TAC, Briscoe begins a section captioned "**FACTUAL ALLEGATIONS**" and sub-captioned "**The 60/40 weighting had a disparate impact and was not job related.**"  ¶ 5 alleges that "[t]he 2003 lieutenant examination was prepared by a commercial vendor called I/O Solutions (IOS)," but "the City dictated to IOS the requirement that 60 percent of candidates' scores would be determined by a written, multiple choice test."  ¶ 6 alleges that IOS knew "based on its training and experience that the written test it provided would have a large disparate impact on African-American candidates," and that "the 60/40 written/oral weighting was not validated or job related."  IOS allegedly knew that "increasing the weight of the oral exam would increase the validity of the examination as a whole," and that "the greater the weight given the written test, the greater would be the effect of that test's disparate impact on the African-American candidates."  Turning to the exam results, ¶ 6 concludes with these allegations:

Using the statistically accepted measure of differences in terms of standard deviations, the group difference between whites and African-Americans on the written test was more than triple the group difference on the oral exam.  In terms of points, the average score for the white candidates was 10.9 points higher than the average for African-American candidates on the written compared to 3.9 points higher on the oral.

These paragraphs are followed by a number of additional paragraphs under the same captions, whose allegations are sometimes factual, sometimes conclusory.  Briscoe's Title VII claim ("First Claim" in the TAC) is stated in ¶¶ 36 and 37, as follows:

36.  The 2003 lieutenant test had a disparate effect upon African

35

American candidates. For example, 31.6% of the African American candidates passed, compared to 58.3% of the white candidates; 15.8%[] of the African American candidates were promoted, compared to 30.2% of the white candidates; all of the white candidates who were promoted were ranked ahead of all of the African American candidates who were promoted; the average difference in test scores between African American and white candidates was 8.1 points; and as noted in paragraph 6 above, this difference was largely due to the difference in written test scores. This disparate impact was unjustified and unlawful.

37. The conduct of the City described above has discriminated against the plaintiff, in violation of Title VII of the Civil Rights Act of 1964, *as amended,* Title 42 U.S.C. Section 2000e-2(k).

Briscoe describes the specific effect of the City's conduct upon him in ¶ 16 of the TAC, which

alleges:

[T]he 60 percent weighting of the written test kept him from being promoted despite his demonstrated superior skills and ability. On the oral exam, he scored the highest of the 77 lieutenant candidates; yet because he did not score well on the written test he ranked 24th on the eligibility list and was not eligible to be promoted.

**B**.

The question raised by the City's motion is whether Briscoe's Third Amended Complaint,

viewed in the light of undisputed surrounding circumstances, alleges a viable disparate-impact claim

under Title VII. One must begin the analysis with the wording of the statute. As the Supreme Court

observed in *Lewis*, 130 S.Ct. at 2197: "As originally enacted, Title VII did not expressly prohibit

employment practices that cause a disparate impact." In 1971 the Court decided *Griggs v. Duke*

*Power Co.*, 401 U.S. 424, 431 (1971), which interpreted a provision in the original Act to

"proscrib[e] not only overt discrimination but also practices that are fair in form, but discriminatory

in operation." Two decades later, in the Civil Rights Act of 1991, "Congress codified the

requirements of the 'disparate impact' claims *Griggs* had recognized."  *Lewis*, 130 S.Ct. at 2197.

That codification appears in 42 U.S.C. § 2000e-2(k), which provides:

> (1)(A) An unlawful employment practice based on disparate impact
> is established under this subchapter only if –
>
>> (i) a complaining party demonstrates that a respondent uses a
>> particular employment practice that causes a disparate impact
>> on the basis of race, color, religion, sex, or national origin and
>> the respondent fails to demonstrate that the challenged
>> practice is job related for the position in question and
>> consistent with business necessity. . . .

In this enactment, Congress did not paint with a broad brush: the 1991 amendment creates

a disparate-impact claim, but important requirements and restrictions apply, as evidenced by words

and phrases such as "only if," "uses a particular employment practice," and "causes a disparate

impact on the basis of" a specific protected characteristic.

Two Supreme Court decisions preceded the 1991 Act, but are still cited and quoted by lower

courts on occasion as declarative of disparate-impact principles.  In *Wards Cove Packing Co., Inc.

v. Atonio*, 490 U.S. 642 (1989), a divided Court held that the nonwhite employees of a salmon

cannery company failed to make a prima facie disparate-impact claim by relying solely upon

statistics showing a high percentage of nonwhite workers in less desirable cannery jobs and a low

percentage of such workers in more rewarding noncannery jobs.  The Court was divided; Justice

White's majority opinion said:

> Our disparate-impact cases have always focused on the impact of
> *particular* hiring practices on employment opportunities of
> minorities. . . . As a general matter, a plaintiff must demonstrate that
> it is the application of a specific or particular employment practice
> that has created the disparate impact under attack.  Such a showing is
> an integral part of the plaintiff's prima facie case in a disparate-impact
> suit under Title VII.

490 U.S. at 656-657 (emphasis in original).

In the Term preceding its opinion in *Wards Cove*, another divided Court decided *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988). Justice O'Connor, joined by the Chief Justice and Justices White and Scalia, wrote the plurality opinion for the Court which contained this language, often quoted by lower courts in subsequent disparate-impact cases:

> [T]he plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged. Although this has been relatively easy to do in challenges to standardized tests, it may sometimes be more difficult when subjective selection criteria are at issue. Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.
>
> Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.

487 U.S. at 994 (internal citation omitted).

That protocol for disparate-impact cases provoked the ire of Justice Blackmun, dissenting in *Ward's Cove*, 490 U.S. at 661, who said:

> Today a bare majority of the Court takes three major strides backwards in the battle against race discrimination. It reaches out to make last Term's plurality opinion in *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), the law, thereby upsetting the longstanding distribution of burdens of proof in Title VII disparate-impact cases.

It has been stated that the 1991 amendment to Title VII was intended to abrogate or minimize

the effect of cases such as these.  Justice Ginsburg, dissenting in *Ricci*, said:

> In response to *Wards Cove* and "a number of [other] recent decisions by the United States Supreme Court that sharply cut back on the scope and effectiveness of [civil rights] laws," Congress enacted the Civil Rights Act of 1991. H.R.Rep. No. 102–40, pt. 2, p. 2 (1991). Among the 1991 alterations, Congress formally codified the disparate-impact component of Title VII.

557 U.S. at 624.

Not surprisingly, when the Second Circuit undertook last year in *Chin* to summarize the elements and requirements of a disparate impact claim, it focused upon the statute.  The court of appeals held:

> To prevail under the disparate impact theory of liability, a plaintiff must show that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-(k)(1)(A)(i).  This requires a plaintiff to (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.  The statistics must reveal that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity.  To rebut a plaintiff's statistics, a defendant may introduce evidence showing either that no statistically significant disparity in fact exists or the challenged practice did not cause the disparity.

685 F.3d at 151 (internal case citations and quotation marks omitted).

The manner in which the Second Circuit applied these principles to the facts in *Chin* is instructive.  Plaintiffs were Asian American police officers employed by defendant Port Authority.  Their Title VII complaint alleged they were passed over for promotion to the rank of sergeant because of their race.  Under the Authority's promotion selection process, to become eligible for promotion to sergeant a police officer had to pass an examination, which would place him on an

39

eligibility list for a period of time.  Commanding officers and the "Chiefs' Board" would periodically recommend individuals from the list for promotion; the ultimate decision to promote an individual to sergeant belonged solely to the Superintendent.  The case involved three consecutive eligibility lists, those of 1996, 1999, and 2002, in effect for a total period from August 1996 through April 15, 2005 (the date the complaint was filed).  Statistics showed that "[a]s of January 31, 2001, no Asian American had ever been promoted to Sergeant,"  685 F.3d at 142.  "The plaintiffs' theory was that the Port Authority's failures to promote them caused a disparate impact through 2001, when the EEOC charge in this case was filed," *id.* at 154, and an expert statistician testified to the jury in support of that theory.

The Second Circuit affirmed judgments in favor of those Asian American officers who filed timely charges.  The Authority argued on appeal that "the promotion process involved three separate steps – recommendation by a commanding officer, approval by the Chiefs' Board, and selection by the Superintendent – and these steps were wholly capable of being separated from each other for the purpose of statistical analysis," with the result that plaintiffs' proof was deficient because they "either failed to identify a *specific* promotion practice resulting in a disparate impact on Asian Americans or failed to show that the Port Authority's promotion process could not be separated into component parts for analysis."  685 F.3d at 154.  The Second Circuit rejected that argument, expressed agreement with the district court that "these 'steps' in the promotion process were not capable of separation for analysis, and concluded that "the decisionmaking process involved in promotions to Sergeant was properly analyzed as one employment practice."  *Id.* at 155.  The disparate impact was proved by the stark statistic that between August 1996 and January 31, 2001, *not a single* Asian American police officer was promoted to Sergeant.  This was at a time when *many* non-Asian

officers were being promoted to that rank. The Second Circuit collects the statistics at 685 F.3d 142 n. 1: During the period from August 1996 to April 15, 2005, 120 non-Asian officers were promoted to Sergeant and 3 Asian officers were promoted, the first two of these being promoted in December 2001.

The viability of Briscoe's Title VII claim against the City of New Haven must be evaluated in the light of these authorities.

## C.

There are fundamental differences between the successful *Chin* plaintiffs' Title VII claim against the Port Authority and Briscoe's Title VII claim against the City of New Haven.

In *Chin,* the Second Circuit did not require plaintiffs to identify a specific promotion practice resulting in a disparate impact on Asian Americans. Circuit Judge Livingston's opinion quotes the Supreme Court's language in *Watson* that "the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities," but then notes the express provision in Title VII that "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). The *Chin* plaintiffs were able to take advantage of that provision because, in the Second Circuit's view, "the decisonmaking process involved in promotions to Sergeant was properly analyzed as one promotion practice." 685 F. 3d at 154-155.

In the case at bar, Briscoe does not invoke that particular provision. Rather, he undertakes to isolate and identify a specific employment practice responsible for a disparate impact on African American firefighters: indeed, in his pleading and throughout the litigation he single-mindedly

41

proclaims that practice and condemns its discriminatory effect.  That practice is the City's choosing "to weight the written test 60 percent and the oral exam 40 percent," a choice which "had a disparate impact on African-American candidates" and "prevented the plaintiff from being promoted to the rank of lieutenant."  I have quoted the Introduction to the Third Amended Complaint, where the 60/40 weighting is the Alpha of Briscoe's pleading; it is also the Omega, in ¶ 36 of the TAC, which alleges collectively that with respect to each statistical disparity between white and African American candidates, "this difference was largely due to the difference in written test scores."  The City's 60/40 weighting of the written and oral exams is the source of all Briscoe's discontent.  It is his *cri de coeur,* expressed in ¶ 16 of the TAC, where Briscoe describes his situation:

> [T]he 60 percent weighting of the written test kept him from being promoted despite his demonstrated superior skills and ability.  On the oral exam, he scored the highest of the 77 lieutenant candidates; yet because he did not score well on the written test he ranked 24th on the eligibility list and was not eligible to be promoted.

In human terms, one can only sympathize with Michael Briscoe.  In the oral exam, each candidate was given a hypothetical fact situation calling for firefighting expertise, and required to analyze the problem and how he would deal with it, while three senior out-of-state experts listen and then grade the candidate: Briscoe came in first out of 77 candidates, and then is told he will not be promoted.  One can easily imagine the Plaintiff thinking, perhaps saying: "This isn't fair. There ought to be a law."

There *is* a law: Title VII.  Plaintiff invokes that law.  But the reality is that Title VII is not intended to address or provide a remedy for unfairness life inflicts on an individual, sometimes with a heavy hand.  Title VII prohibits employers from using practices that discriminate against individuals on the basis of their race (among other factors).  One of the forms that proscribed

discrimination can take is an employment practice, taken in good faith and for non-discriminatory reasons, which nonetheless has a disparate impact upon persons of a protected group, such as African Americans.  That is the claim Briscoe makes against the City in this case.  His claim is that the 60/40 weighting of written and oral examinations caused a disparate impact upon African American candidates for promotion to lieutenant.  Out of the City's entire promotion selection process, that weighting is the only specific employment practice Briscoe identifies as causing a disparate impact violative of Title VII.

Thus it becomes necessary to consider the evidence in the record with respect to the effect the weighting of the written and oral exams had upon candidates for promotion.  In that regard, and given Plaintiff's theory of the case, the most significant statistics were generated by the promotions to lieutenant the City made in November and December, 2009.  That was the moment of impact for Briscoe, who thought he deserved promotion and was denied it.  The examinations Briscoe challenges in this action were administered and graded by the City in 2003, but they had no impact at that time because the City decided to disregard the test results.  That decision put promotions in the Fire Department on hold and generated nearly six years of litigation, which for practical purposes came to an end on July 29, 2009, when the Supreme Court decided *Ricci*.  At that point the City, bobbing queasily in the wake of the Court's *Ricci* decision, decided to use the 2003 test results to fill the 16 vacancies for lieutenant then extant.  Three of the 16 promotions made at the end of 2009 went to African-Americans.  Briscoe was not one of them.

Briscoe was not one of them because his stellar performance on the oral exam was offset by a poor performance on the written exam.  Specifically, Briscoe scored 92.08 on the oral exam (first among the 77 candidates) but 59.00 on the written exam (only 12 candidates of the 77, including

Briscoe, were below 60.00 on the written exam).[14]  With the oral exam counting for only 40 percent

of the final score, Briscoe's final score was 72.23.  That was a passing score, since the pass/fail cutoff

was set at 70, but his rank among the 77 candidates was 23, so Briscoe was not promoted to one of

the 16 vacancies in 2009.

As previously noted, the one specific employment practice Briscoe identifies and contends

causes a disparate impact on the basis of race is the City's decision to use the score weighting of

written exam 60 percent / oral exam 40 percent.  However, the statistics show that if the 2003 exam

results were weighted 40/60 written/oral, 3 African-Americans would be promoted.  If the weighting

was 30/70 written/oral, 3 African-Americans would be promoted.  If the oral exam was weighted 100

percent and the written exam was discarded, 3 African-Americans would be promoted.  The number

of African-Americans actually promoted, using the 60/40 written/oral weighting, was 3.  The only

effect of reducing the weight of the written exam component, or eliminating it entirely, upon an

individual's total score is to change the *identity* of the three African-American firefighters who would

be promoted to the lieutenant vacancies then existing.  Briscoe is an obvious beneficiary of that

exercise, since his oral exam score was the best in the field of candidates.  His ranking, if the

weightings were altered as hypothesized, would be: written 40/oral 60 - rank 10; written 30/oral 70 -

rank 4; written 0/oral 100 - rank 1.  *See* City's Ex.D, *supra*.  If the weightings were different, Briscoe

would have been one of the three African-Americans promoted to one of the 16 lieutenant vacancies,

and one of the three African-Americans actually promoted would not have been.  But whatever

---

[14] These scores are taken from the City's scoring spreadsheet, Ex. D to the City's brief
[Doc. 224-1].  This is a publicly generated document, reflective of the exam test results Plaintiff
refers to and incorporates by reference in the TAC.  The Court may take notice of them on this
motion to dismiss; there is no need to convert the motion into one for summary judgment.

hypothetical weightings may be applied to the scores on the 2003 exams, three African-Americans would have been promoted, as indeed three were actually promoted after use of the challenged 60/40 weighting.

While it is impossible not to sympathize with Briscoe's situation, I find myself unable to discern in his pleadings or the surrounding circumstances any basis for concluding that the City used an employment practice which caused a disparate impact on the basis of race. It would be one thing if the statistics showed that the City's use of the 60/40 weighting resulted in no African-Americas being promoted, whereas reducing or discarding the written exam component would result in three African-Americans being promoted. Such proof would arguably support an inference that the prominence or presence of the written exam component caused a disparate impact upon African-American candidates. However, the facts are that however one adjusts the weighting, or even weighs the oral component at 100 percent and the written component at 0, three African-Americans would under any formulation be promoted on the basis of the 2003 exam scores – just as three were in fact promoted using the 60/40 weighting. That proof supports an inference that the 60/40 weighting the City used had no disparate impact on African-American candidates *as a race*. Of course, the 60/40 weighting had an adverse impact upon Briscoe *as an individual*: his lesser showing on the written exam compromised his greater showing on the oral exam, and cost him a promotion. But Title VII is not concerned with the effect upon an individual of the academic, educational or professional niceties of grading an examination for promotion. Title VII prohibits an employer's use of a practice that has a disparate impact upon members of a race or other protected group. To state a prima facie claim, a Title VII plaintiff must allege facts showing that is what actually occurred, or at the very least that it is plausible to think so. These requirements are imposed by the Act itself, not by case

law or judges' decisions, however lofty.

I conclude that the Plaintiff in this case has not pleaded a prima facie Title VII claim. Stripped of conclusory rhetoric and distilled to reveal its essence, Briscoe's complaint is really about the 60/40 weighting's adverse impact upon him personally, not a disparate impact upon African American firefighters. When the *Ricci* guns fell silent and the fog of war lifted, African Americans were promoted to fill 3 of the 16 vacancies for lieutenant. Briscoe, an African American, was not promoted. The effect of the 60/40 weighting was to deny him promotion at that time, although he passed the test. The weighting did not have that adverse effect upon the 3 African Americans who were promoted.

As the litigation progressed, counsel for Briscoe focused less upon the weighting of the exams and more upon other factors. With respect to "the disparate impact argument," counsel for Briscoe said during the hearing on the motions, "I want to claim the entire breadth of all the numbers that are in the case." Tr. at 127. That led counsel to quote Justice Kennedy's opinion in *Ricci:* "The racial adverse impact here was significant, and petitioners [the white firefighters] do not dispute that the City was faced with a prima facie case of disparate-impact liability." 557 U.S. at 586. The numbers Justice Kennedy cited to support that comment related solely to the pass rates, stated in percentages, of black, white and Hispanic groups of candidates, which led him to say: "The pass rates of minorities, which were approximately one-half the pass rates for white candidates, fall well below the 80-percent standard set by the EEOC to implement the disparate-impact provision of Title VII." *Id*.

These thoughts voiced by Justice Kennedy, counsel contends, give Briscoe "a very big leg up." Tr. at 129. I do not agree. Justice Kennedy was contemplating a disparate-impact claim that

*might* be asserted by someone against New Haven in the future.  I am concerned with a disparate-impact claim that *has* been asserted by Briscoe.  Pass rates for the 2003 exams, seized upon by Justice Kennedy,  are irrelevant to Briscoe's claim.  Briscoe passed the exam.  He brings this Title VII suit "as an individual, not on behalf of a class," which means that "to achieve individual relief, . . . he must establish that his individual circumstances entitle him to that relief." *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1255 (1990) (Title VII claim by black police officer denied promotion to sergeant).  A minority firefighter in New Haven who failed the 2003 exam might take encouragement from Justice Kennedy's ruminations about pass rates in *Ricci*; Briscoe is not in a position to do so. The same considerations apply to the several numbers Briscoe collects in ¶ 36 of the Third Amended Complaint.  Briscoe's charge against the City, first expressed in his CHRO-EEOC charge and now in the TAC, was then, now is, and always has been the unfairness visited upon him by the 60/40 weighting of the written and oral exams.  One must surmise that Briscoe thinks the oral exam, in which he excelled, was job-related and beyond reproach.

A revealing precursor to the case at bar may be found in Briscoe's brief [Doc. 197] to Judge Arterton in the *Ricci* case, No. 3:04-cv-1109, on remand from the Supreme Court.  That brief, filed on January 4, 2010, responded to the *Ricci* plaintiffs' objections to Briscoe's motion (ultimately unsuccessful) to intervene in that case.  Briscoe argued at that time:

> [D]escribing Mr. Briscoe as seeking promotion on the basis of his race, as Plaintiffs do, misses the most fundamental point about his claim.  Mr. Briscoe's claim is that he should be promoted because his performance on the 2003 exam demonstrated that he is one of the most highly qualified candidates for the lieutenant position.  He does not seek a do-over; he simply wants the exam that he took along with everyone else to be scored properly.
>
> To be sure, Mr. Briscoe cannot prevail on his claim unless he also

> shows that the exam with the current scoring system had a disparate
> impact on African American candidates.  But that requirement is, as
> the Supreme Court emphasized, *see Ricci*, 129 S.Ct. at 2662, is
> simply a threshold showing; the more fundamental question is
> whether the test is job related.

Brief at 3-4.

In effect, Briscoe said to Judge Arterton then that to cross the threshold of a viable Title VII claim, he would have to show that "the current scoring system had a disparate impact on African American candidates."  He is saying to this Court now that his Third Amended Complaint, read in the light of the accompanying statistics, sufficiently makes that showing at the pleading stage. It does not.  The case for Briscoe comes down to this: The 2003 exams should be "scored properly," and the way to do that is to disregard or alter the 60/40 weighting, thereby transforming Briscoe's promotion prospects.  That conviction, however sincerely, forcefully or passionately held, does not support a Title VII claim of disparate impact on the basis of race.

In any event, on all the evidence I may properly consider on these motions, for the reasons stated I conclude that Briscoe does not and cannot show that the 60/40 weighting of exams had a disparate impact on African Americans as a race.  His action, while not time barred, must be dismissed on substantive grounds.

## VI.

The briefs of counsel raise and discuss other issues which, in the view I take of the case, I need not consider at length.

### A.

The City and the Intervenors contend that any relief Briscoe might otherwise be entitled to

is precluded by a particular section in Title VII, found in Section 106, codified at 42 U.S.C. § 2000e-2(l), which provides:

> It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

The precise issue in this case is whether, if Briscoe succeeded on the merits of a Title VII claim against the City, the Court in fashioning a remedy would be inhibited or precluded by the provision that it is "an unlawful employment practice" to "adjust the scores of" or "otherwise alter the results of, employment related tests on the basis of race . . ."  Counsel for Briscoe, resisting such a suggestion, stresses the noun "respondent" and argued that "the words of the statute certainly do not restrict the authority of a court."  Subsection 2(l) "just isn't in the picture, when and if your Honor gets to the point of shaping relief."  Tr. 143.

I think that Briscoe has the better of the argument.  The wording of the statutory prohibition suggests that it is addressed to a "respondent," in this context an employer, not a Chancellor in Equity.  When the Second Circuit considered Section 106 in *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999), it said: "The statute, on its face, clearly prohibits methods which utilize different scoring techniques or adjust candidates' scores on the basis of race," and: "The legislative history of the statute also confirms that it intended to prohibit 'race norming' and other methods of using *different* cutoffs for different races or altering scores based on race."  180 F.3d at 53 (emphasis in original).  The sense one gets of the statute is that Congress is cautioning employers about wrongs they cannot commit, rather than having the presumption to instruct judges in equity about what they cannot include in a remedy intended to right an employer's wrong.  So I conclude as a matter of law

49

that if this case comes to the remedy stage, § 2000e2(l) will have no office to perform in fashioning a proper remedy.  That is a holding which may be regarded as sufficient to present the question to the Court of Appeals for review, if appeals are taken from this ruling.  I say nothing more on this aspect of a remedy, since the question does not arise for the present, Briscoe's Title VII claim being dismissed.  To the extent that the City or Intervenors rely upon § 2000e2(l) as an alternative basis for a motion to dismiss Briscoe's complaint, that alternative motion is denied.

## B.

The City and Intervenors also argue that a remedy to which Briscoe might otherwise be entitled is barred by the Second Circuit's direction on the prior appeal in this case that "we limit Briscoe's equitable relief insofar as it may interfere with the relief – present and future – afforded to the *Ricci* plaintiffs by the certification of the exam results."  654 F. 3d at 209.  That issue relates solely to the scope of a remedy, a potentially complex subject.  Given this ruling's dismissal of Briscoe's action, I say nothing  more about issues of remedy.

## VII.

Briscoe's Third Amended Complaint pleads as a Second Claim violations of the New Haven City Charter and Civil Service Rules in respect of the promotional examinations.  For this municipal law claim,  Briscoe  invokes  the supplemental jurisdiction of  this federal court pursuant to 28 U.S.C. § 1367.  The Court having dismissed Briscoe's sole federal Title VII claim, supplemental jurisdiction will be declined and his local law claim dismissed without prejudice.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as

well.").

## CONCLUSION

For the foregoing reasons:

The motions of Defendant City of New Haven and the Intervenors to dismiss Plaintiff's Third Amended Complaint as time-barred, whether by statute of limitations or laches, are DENIED.

The motions of Defendant City of New Haven and the Intervenors to dismiss the First Count of Plaintiff's Third Amended Complaint for failure to state a federal claim upon which relief can be granted are GRANTED.

The Second Count of Plaintiff's Third Amended Complaint, alleging a claim for violation of the City of New Haven's City Charter and Civil Service Rules, is DISMISSED WITHOUT PREJUDICE.

The Clerk is directed to close the case.

It is SO ORDERED.

Dated:   New Haven, Connecticut
          September 9, 2013

                                        /s/Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        SENIOR UNITED STATES DISTRICT JUDGE